**CROWN CORK & SEAL CO., Inc., v. FERDINAND GUTMANN & CO.**

No. 89.

Circuit Court of Appeals, Second Circuit.

Dec. 14, 1936.

MANTON, Circuit Judge, dissenting.

Gifford, Scull & Burgess, of New York City (George F. Scull, of New York City, and John J. Darby, of Washington, D. C., of counsel), for plaintiff.

Hauff & Warland, of New York City (William E. Warland and Francis H. Warland, both of New York City, of counsel), for defendant.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

The patents in suit relate to a type of bottle closure known as a "spot crown cap" and to methods of making such caps. The plaintiff has appealed in respect to Warth patents No. 1,899,783 (claim 4) and No. 1,956,481 (claims 6 and 16), which were held invalid.[1] McManus patent No. 1,339,066 (claims 3 and 8) and Warth patents reissue 19,117 (claims 1 and 3) and No. 1,967,195 (claims 1, 2 and 3) were held valid and infringed; and as to these the defendant has appealed. The defendant has also appealed from dismissal of its counterclaim for noninfringement of Cohn patent No. 1,921,808.

Long prior to the patents in suit the bottling art was familiar with crown caps which had no center spot. Such caps were formed of a thin metal shell, containing a cushion disc of natural cork or composition cork adapted to seal the mouth of the bottle when the cap was pressed into engagement with its lip. There were disadvantages, however, in having the contents of the bottle come into contact with the cork disc. Consequently the practice developed of applying to the face of the cork disc a thin sheet of material, such as tin foil or glazed paper, impermeable to the liquid contents of the bottle. This may take the form of an "overall" facing, or of a partial or "spot" facing. In the "overall," the protective foil or paper covers the entire face of the cushion disc. Such a form of crown cap is satisfactory when the contents of the bottle are not under gas pressure, but is likely to result in leakage in the case of pressure beverages. In spot crown caps the protective facing of the cork cushion is a "spot" or disc of such diameter as to extend only part way over the lip of the bottle and permit the rest of the lip to make contact with the cork cushion, thus forming a more perfect seal and at the same time preventing the liquid from touching the cork. The chief difficulty in the manufacture of such caps has been in affixing the spot to the cork disc. It must be accurately centered and firmly attached. From 1914 the White Rock Company has used a tin foil spot which is mechanically attached to the cork disc. The patents in suit, however, relate to spots which are adhesively attached by a "fusible binder"; that is, the adhesive must be one which is softened and made sticky by heat, as distinguished from one which has to be moistened to be applied. For the commercial success of spot crown caps it is essential that they be manufactured cheaply and this involves rapidity of assemblage. Operating under the patents in suit the plaintiff applies spots to crowns at the rate of 500 per minute for each operating unit and is able to sell the entire cap at a price of about six for one cent. Its sales amount to about 9 million gross per year.

■ 1. With this brief preliminary exposition we may turn to the patents in suit, of which the first is McManus patent No. 1,339,066, granted May 4, 1920, upon an application filed November 17, 1915. Claims 3 and 8 were in suit and were held valid and infringed. This patent describes and claims a center spot crown cap as an article of manufacture, and the claims in suit require that the spot be united with the cork or composition cushion disc "by means of a fusible binding medium." The specifications explain that crown caps without the center spot were old and were subject to disadvantages because the liquid came into contact with the cork or cork-composition disc. Apparently McManus conceived that his inventive thought was the idea of overcoming these objections by adding the center spot. He was not, however, the originator of spot crown caps. As already noted, the White Rock Company began in 1914 to use mechanically attached spots. DeMuth's British patent No. 16075, issued in July, 1914, upon an application dated July 12, 1913, shows a liquid-resisting spot secured to the cork disc "by cementing or in any other appropriate manner." The United States patent No. 1,199,026 issued in 1918 to Alberti, whose

---

[1] Warth patent No. 1,899,762 (claims 7 and 9) was also held invalid, but no appeal has been taken as to this.

application was dated October 3, 1914, also discloses a spot cemented to the cork disc. Alberti used a moist cement, albumen, which was coagulated and caused to stick by the subsequent application of heat and pressure. Concededly the only new feature, if any, which McManus added was the use of a "fusible binding medium" instead of a moist adhesive. As he points out, a fusible binder between the tin cap and cork cushion was already old, and preferably he specifies the same binding material to attach the spot. Moreover, the Koch patent No. 1,238,156, issued in 1917 on an application filed September 21, 1915, shows a fusible binder, gutta percha, as the medium for attaching the "overall" type of spot. Thus McManus is reduced to the proposition that, although heat fusible adhesives were old for securing discs to caps, and "overalls" to discs, his was the first disclosure with respect to fastening a center spot by such an adhesive. It is impossible to believe that it required ingenuity worthy of the name of invention to take the step of using upon the "spot" the same adhesive used upon the "overall" coating. Nor was this idea immediately seized upon as the solution of an existing problem. Rather the problem, as the history of the development of the industry shows, was to perfect a machine that would operate with sufficient accuracy and speed to render manufacture commercially successful. McManus himself, though attempting to manufacture spot crown caps, did not utilize commercially the idea of a fusible binder until about 1926. Our conclusion is that claims 3 and 8 are invalid for lack of invention.

2. Warth "Paper Spot" patent No. 1,899,783. This was granted February 28, 1933 on a divisional application filed October 31, 1930, of a parent application filed May 5, 1929. Only claim 4 was in suit; it was held invalid. This claim calls for a crown cap with a center spot "of hard, high-gloss paper having a varnished outer surface" and fastened to the cushion by gutta percha. For high pressure, acidulated beverages, such as ginger ale, tin foil spots were not suitable, because the acid would eat through the foil, thus permitting the beverage to acquire a corky taste and to lose pressure through the pores of the cork or composition cushion. The object of the patent was to avoid the ill effects of the use of tin foil. The only "problem" was to select a facing for the cushion which would withstand the attack of acidulated liquids and be not too thick to bend when pressure was applied in closing the cap upon the bottle. A paper facing, varnished to prevent absorption, was old in the art. Smith's patent No. 983,319, of 1911, discloses the use of a varnished manila paper for an "overall" cap-facing. The McManus patent already discussed recommended for the "spot" facing "a hard parchment paper, or any other paper so treated as to make it non-absorbent." The Lange patent No. 1,657,802, issued in 1928, application filed December 16, 1924, used a varnished paper to make a cover for preserve jars and the like. Warth testified that it took experimentation over a considerable period of time to select a paper of the right toughness, density and thinness and a varnish which would impart no flavor to the bottled beverage, but with this prior art we can see no room for invention in what he did, and we agree with the District Court that claim 4 of the Warth paper spot patent shows no novelty or invention and is invalid.

3. Warth patent No. 1,956,481, granted April 24, 1934, application filed June 16, 1933. Claims 6 and 16 were in suit and were held invalid. These claims call for a spot crown cap in which the spot is stuck to the cushion by a thermoplastic adhesive composed of nitrocellulose and a resin, which is a better adhesive than the conventional gutta percha. Both the plaintiff and the defendant use as an adhesive a preparation manufactured and sold by the du Pont Company under the name "4620." This came on the market in 1932, and became the medium adopted by both litigants, the defendant's commercial use having started in June or July, 1933, and the plaintiff's about one year later. Concededly it is an anticipation of the patent in suit, unless Warth can carry back his date of invention and reduction to practice. This he attempts to do, contending that his date of conception was the fall of 1926 and his reduction to practice at least as early as January, 1932. It is doubtless true that Warth was experimenting in 1926 with nitrocellulose, but he plainly had not then reached the goal, for, according to his own testimony, the mixture he had achieved "was not as good as gutta percha." Not until 1930 did Warth tell McManus of the possibility of using a nitrocellulose-resin cement, and he had not then worked out any formula for the mixture. About a year later McMan-

us asked Weisenberg to work on the idea, without telling him of Warth's previous attempts to find the right mixture. Then in January, 1932, the du Pont Company delivered to the plaintiff a can of "4620" to be tried out as an adhesive for spot crown caps. Warth instructed his secretary to see if it would work, saying, "That is something I have been trying to find, as you know, for a long time." It is possible that Warth had given some ideas to the du Ponts, but it seems plain that they and not he worked them out. The above-quoted statement to Warth's secretary is wholly inconsistent with the contention that "4620" was his own work. So also are the fact that he made an affidavit in December, 1932, speaking of gutta percha as the best of the known adhesives, and the fact that between the fall of 1926 and October 30, 1930, he filed no less than five patent applications, each of which sang the praises of gutta percha and made no mention of nitrocellulose and resin. Under the severe rules applicable to carrying back the date of an invention, Warth has failed to carry the burden of doing so, and we hold that patent No. 1,956,481 was anticipated by "4620."

4. Warth Reissue No. 19,117 dated March 20, 1934. This is a reissue of patent No. 1,788,260 which was applied for January 7, 1927, and granted January 6, 1931. Application for reissue was filed January 23, 1934. Claims 1 and 3 were in suit and were held valid and infringed. These are process claims for a method of manufacturing spot crown caps. The "spot" material is in the form of a strip of tin foil or liquid-resisting paper, coated on the under side with a thermoplastic adhesive. The patent requires drawing the strip over a die and under a punch, cutting the spot from the strip by the punch, which positions the spot upon the cork disc, "and upon assembly applying simultaneously to the spot pressure and sufficient heat to render the adhesive tacky, thereby causing the spot to adhere" to the cork disc, and then permitting the adhesive to cool and harden. Claim 3 merely adds that the cooling step shall occur "while subjecting the assembled unit to pressure." It is contended by the defendant that, if the claims can be sustained as valid at all, they must be limited to mean that the heat and pressure are applied by the cutting punch; and, if so limited, the defendant does not infringe, for the defendant uses a cold cutting punch[2] which positions the spot on a cork disc previously heated sufficiently to cause the spot to adhere while the cap is carried to the next stage, where a hot plunger applies heat and pressure. We think this contention is well taken.

The parent application originally contained a paragraph which disclosed the preheating step and had claims sufficiently broad to cover it, but on December 3, 1930, the preheating passage was stricken from the specifications, all claims were canceled, and the present first claim was substituted. That left the specifications with the statement that the preferred method of applying the spot material to the cap is "to utilize, at the time of assembly, both heat and pressure," and that "the punch 20 may be maintained at an elevated temperature, as by means of a burner 23," and left the claim, in so far as it referred to heating, as follows: "And upon assembly applying simultaneously to the spot pressure and sufficient heat" to cause the spot to adhere. This was the form in which the patent was granted. It clearly means *applying* the heat at the time of pressure, not pressure by a cold punch on an already heated crown. Further considerations lead to the same conclusion, namely, that the claims require the heat and pressure to be applied by the cutting punch. In the plaintiff's "slide machine," which goes back to 1917, a strip of spot material and a strip of adhesive (gutta percha) were drawn beneath the punch which descended to cut the spot and deposit it upon a slide member, which then passed under a heated plunger with a suction device which sucked up the spot and held it until a cap containing the cork disc passed beneath, when the plunger descended, pressing the spot upon the cork. While the mechanism of the slide machine is quite different from that of the machine by which Warth's process is applied, it must be remembered that his patent is not for the machine but for a method of

---

[2] Although we refer to the cutting punch as "cold," it actually gets heat by radiation from the adjacent "preheater" and "post heater" plungers so that its temperature may be as high as 140° F., but this is not enough to make the adhesive sufficiently tacky to adhere to the cork unless the latter has been preheated.

manufacture involving cutting the spot and causing it to adhere to the cork disc by the application of heat and pressure. To read the claims of the reissue patent to mean a cold punch to cut the spot and a hot plunger applied later to fasten it to the cork disc would make them invalid under the old "slide machine." To read them to mean a cold punch which positions the spot upon a preheated cork would be inconsistent with the fact that the preheating specification was deliberately divided out and later claimed in Warth's "preheating patent" hereafter to be discussed. Consequently we conclude that the defendant's method of manufacture does not infringe claims 1 and 3 of reissue No. 19,117.

5. Warth "preheating" patent No. 1,967,195. This was granted July 17, 1934, upon a divisional application filed April 4, 1933. Claims 1, 2, and 3 are in suit and were held valid and infringed. They are process claims for the preheating method already referred to. The cork disc in the cap is heated before it passes under the cutting punch which positions the spot on the cork. The heat of the cork makes the adhesive of the spot tacky, so that the pressure of the cutting punch causes it to adhere. At the next step a heated plunger is pressed down on the spot; then it is passed under a cold plunger and kept under pressure until the adhesive has cooled. Each of the claims in suit calls for "heating the pads in the caps"; that is, for preheating of the cork disc before the spot is positioned upon it. This is the feature which distinguishes the patent from the prior reissue. It is the process used by both the plaintiff and the defendant. The defendant infringes, if the claims are valid. We think they are invalid for laches in filing the application for them. Webster Co. v. Splitdorf Co., 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792.

The parties are in dispute as to the effective date of application for the claims in suit, the defendant contending for the day the claims were actually filed, namely, April 4, 1933, and the plaintiff for the date of the parent application, namely, January 7, 1927. As already explained, the reference to preheating in the parent application was stricken out on December 3, 1930. Previously, on November 7, 1930, Warth had filed a divisional application No. 494,201 to which he had transferred the preheating method; it claimed only the spot material strip as an article of manufacture. As we have previously shown, Warth's patents No. 1,788,260 and reissue 19,117 contained no claims broad enough to cover preheating. Hence there was no claim for the preheating method on file in the Patent Office from December 3, 1930, until April 4, 1933, when Warth applied by his second divisional application for the preheating patent. The disclosure, however, had been continuously on file since January 7, 1927; and so the plaintiff contends that it is entitled to that filing date. We do not so understand the law, as laid down in Webster Co. v. Splitdorf Co., 264 U.S. 463, 471, 44 S.Ct. 342, 344, 68 L. Ed. 792. Prima facie the two-year time limit applies to divisional applications, and an applicant who waits longer before claiming the invention disclosed in his application must justify his delay by proof of some excuse. No such excuse appears here. Had Warth chosen to retain in his parent application broad generic claims which might cover the preheating method, then indeed the Splitdorf rule might not be applicable. Carson v. American Smelting & Refining Co., 4 F.(2d) 463, 470 (C. C.A.9). The delay would be excused since a patentee is not to be held at fault for failure to have divided his claims at an earlier date, merely because he might have, when instead he had elected to prosecute the broader claims of his original application. Hartford-Empire Co. v. Nivison-Weiskopf Co., 58 F.(2d) 701 (C.C. A.6). But, in the case at bar, for a period of more than two years Warth apparently did not wish to claim the preheating method, having deliberately canceled the preheating specification from his original application and shaped his claims so as to exclude it and his patent having been granted January 6, 1931. He made no claim for preheating until more than two years thereafter, namely, April 4, 1933. In the meantime a patent containing claims for the preheating method had been granted to Johnson on April 5, 1932, and it was Warth's discovery of this fact which stirred him to action. As in the Splitdorf Case, had it not been for this competitor, Warth might never have considered the subject worth claiming as an invention. These circumstances invite operation of the two-year limitation designed to protect the public against obtaining in effect an extension of a patentee's monopoly by apathy and unexcused delay in bringing forward by divisional or reissue applications claims broader than those

originally sought. See Westinghouse Electric & Mfg. Co. v. Jeffrey-DeWitt Insulator Co., 22 F.(2d) 277 (C.C.A.2). Wagenhorst v. Hydraulic Steel Co., 27 F.(2d) 27, 29 (C.C.A.6); Otis Elevator Co. v. Atlantic Elevator Co., 47 F.(2d) 545, 549 (C.C.A.2); Wirebounds Patents Co. v. Saranac Automatic Machine Corp., 65 F.(2d) 904 (C.C.A.6); compare Phelan v. Green, 71 F.(2d) 298, 301 (Cust. & Pat. App.).

6. By counterclaim the defendant charged infringement of patent No. 1,921,-808 to Cohn. The counterclaim was dismissed on the ground of noninfringement. This was plainly right; the plaintiff had neither infringed nor threatened to do so.

For the reasons stated in the foregoing opinion, the plaintiff should have been denied relief upon all its patents. The interlocutory decree is modified, and the cause remanded, with directions to dismiss the bill of complaint.

MANTON, Circuit Judge (dissenting).

The District Judge entered a decree for the plaintiff holding the McManus patent No. 1,339,066, Warth patents reissue No. 19,117 and No. 1,967,195 valid and infringed. He dismissed the complaint on the merits as to the Warth patents No. 1,899,782, No. 1,899,783, and No. 1,956,481. I agree with his reasons and conclusions which are fully and ably stated in Crown Cork & Seal Co. v. Gutman & Co. (D.C.) 14 F.Supp. 255.

I accordingly dissent from the modification of the decree.

MANTON, Circuit Judge, dissenting.