## MAGNUS HARMONICA CORP. v. LAPIN PRODUCTS, Inc.

United States District Court
S. D. New York.
Dec. 18, 1952.
June 23, 1953.

Burgess, Ryan & Hicks, New York City, Newton A. Burgess, and H. H. Hamilton, New York City, of counsel, for plaintiff.

Harry Price, New York City, for defendant.

CONGER, District Judge.

This is a suit for infringement of three patents issued to Finn H. Magnus which were assigned to the plaintiff corporation.

The defendant denies infringement, asserts the invalidity of the patents and counterclaims for unfair competition and for a declaratory judgment of invalidity.

The Letters Patent involved are as follows:

No. 2,373,129, issued April 10, 1945, of which the plaintiff relies upon Claims 1, 2, 3, 5, and 7.

No. 2,407.312, issued September 10, 1946, of which the plaintiff relies upon Claims 4 and 5.

No. 2,416,451, issued February 25, 1947, of which the plaintiff relies upon Claim 2.

I shall hereafter refer to these patents by their last three numbers respectively.

Two of the patents in suit, namely '129 and '312 concern harmonica reed plates molded of plastic with integral reeds.

Patent '451 concerns the mold to be used in making a reed plate of the kind described in the '129 patent.

The defendant has, since 1947, manufactured plastic toy harmonicas embodying a plastic reed plate with intergral reeds upon which it has a patent (No. 2,572,818) issued October 23, 1951 to David Rosenheim, one of its officers.

The claims relied upon under the '129 patent read as follows:

"1. For a musical instrument, a reed plate formed of a plastic composition and having a reed slot, and a reed having its heel end integrally connected to one side of said reed plate from a point at one end of said slot to a point beyond said slot end.

"2. For a musical instrument, a reed plate formed of a plastic composition and having a reed slot, and a reed having its heel end integrally connected to one side of said reed plate from a point at one end of said slot and intermediate the sides of said plate to a point beyond said slot end.

"3. For a musical instrument, a reed plate formed of a plastic composition and having a reed slot, and a reed having its heel end integrally connected to one side of said reed plate from a point at one end of said slot to a point beyond said slot end, a portion of said reed intermediate its ends being located above said side of said plate.

"5. For a musical instrument, a reed plate formed of a plastic composition and having a reed slot, and a reed having its heel end integrally connected to one side of said reed plate from a point at one end of said slot to a point beyond said slot end, the lower surface of said reed gradually merging through a concave curve into the wall at said end of said slot.

"7. For a musical instrument, a reed plate formed of polystyrene and having a reed slot, and a reed having its heel end integrally connected to one side of said reed plate from a point at one end of said slot to a point beyond said slot end."

It is apparent upon examination that the reed plate with integral reeds used in the defendant's Toymonica is substantially identical with the reed plate and reeds described in the '129 patent.

Richardson, the plaintiff's expert, testified that claim 1 of the '129 patent accurately described the reed plate and reeds of defendant's Toymonica. He said that claim 7 which differs from claim 1 only in the substitution of "polystyrene" for "a plastic composition" also describes it since the accused device is made of polystyrene.

Claim 5 appears to resemble more accurately claim 2 of the '129 patent, although the plaintiff relates claim 5 to claims 1, 3 and 7 and distinguishes claim 2 from all of these.

Claim 2 describes the reed heel end as "integrally connected to one side of said reed plate from a point at one end of said slot and intermediate the sides of said plate to a point beyond said slot end" which results in a rounded connection.

This feature is not present in the reed plate and reeds of the Toymonica offered in evidence.

However, an inspection of one of defendant's molds reveals that the projections have been chamfered on the corner so as to form the fillet connection of the reeds with the reed plates. It would seem, therefore, that reed plates made from this mold embody this feature of claim 2. Richardson so stated.

The claims relied on under the '312 patent read as follows:

"4. For a harmonica, an elongate flat body of plastic material having a plurality of molded tuned reeds of varying thickness which were molded in tune projecting integrally from one edge thereof in spaced relation to each other longitudinally of said body in the order of their tones.

"5. For a harmonica, a molded elongate flat body of plastic material having a plurality of molded tuned reeds which were molded in tune projecting integrally therefrom in spaced relation to each other."

Richardson testified that these claims describe defendant's reed plates.

Actually, these claims embrace only a so-called reed stick which must be assembled with a reed plate. Upon assembly, this device approximates the defendant's reed plate with integral reeds. Richardson illustrated this by cutting the plaintiff's reed plate along a line passing through the end of the slot at which the reed is anchored.

The claim relied on under the '451 patent reads as follows:

"2. A mold for molding a reed plate having a slot and an integral reed overlying said slot, comprising a section having a recess shaped to form a flat body and a projection extending upwardly from the bottom of the recess to form a slot in said body, and a complemental section having a recess in overlying relation to said projection with its bottom spaced from the top of the projection to form a reed, one end portion of said last-mentioned recess being shaped to snugly fit against one end portion of said projection, the other end portion of said last-mentioned recess extending beyond the other end of said projection whereby the recesses in the two sections communicate with each other only at said other end of the projection, said recesses forming a mold cavity between said sections, one section having an inlet for injection of molding material into said cavity."

Richardson said that he had inspected one of defendant's molds and he explained how claim 2 of patent '451 describes the construction of defendant's mold. He made a sketch of the mold and broke down claim 2 in relation to it.

Defendant's case on noninfringement is meager. It did not challenge Richardson nor did its counsel adduce from its own expert, Mantell, any testimony tending to distinguish the devices.

A distinction was sought to be made between the accused devices and patents '312 and '451 by other means which will appear hereafter.

My judgment, therefore, is that defendant's device is a clear infringement of claims 1, 2, 3, 5 and 7 of plaintiff's patent '129. I find that the reed plate of defendant's harmonica is practically a replica of the reed plate contemplated by the claims 1 and 7 of plaintiff's patent and as to the remainder of the claims there is such identity as to constitute infringement.

Defendant contends that its harmonica is a toy and a tune may not be played on it. It asserts this defense particularly as against claims 4 and 5 of '312 wherein the reeds are described as "molded in tune."

This defense, if good, would be applicable to both patents '129 and '312. However, I do not regard this as a defense to either patent. It may very well be that defendant's device is a "toy" but that is rather a general term and covers a large field. In defendant's patent the device is described as " * * * an improvement in children's toy *musical instruments*," (italics mine) and in several claims of said patent it is called a "three-piece toy *harmonica*." (Italics mine.) If infringement is present, calling defendant's harmonica a toy will not excuse it.

I believe it to be correct that defendant's harmonica is not in tune and cannot play a tune while plaintiff's harmonica is in tune and may be played.

However, defendant's harmonica does make a sound; one might say a musical sound. It certainly was intended for use by a child who might very well get as much satisfaction out of defendant's harmonica as an older person would out of plaintiff's harmonica. Without a sound coming from it, it would be of no value even to a child.

It is not necessary that an article to infringe must be an exact copy of the other article. Sufficient to say there must be sufficient similarity so that it may be said that it infringes.

While my decision hereafter as to the validity of '312 does away with the necessity of determining the infringement of it [1] I feel I should at least state my views

1. Container Co. v. Carpenter Container Corp., D.C.Del.1951, 99 F.Supp. 167, affirmed, 3 Cir., 1952, 194 F.2d 1013;

Dubil v. Rayford Camp & Co., D.C.S.D. Cal. Central Div.1949, 86 F.Supp. 570, modified, 9 Cir., 1950, 184 F.2d 899.

on this question. Were patent '312 valid I feel that defendant's device would be an infringement of it. The same may be stated in connection with '451 the infringement of which I now discuss even though unnecessary. See footnote below.

The defendant argues that it does not infringe patent '451 because the mold described therein is not used by the plaintiff nor defendant. He drew from Magnus, Richardson and Hugg that a certain feature of the mold depicted in the patent application is not used to make the plaintiff's reeds. This feature involved a fixture whose function is to press the reeds down into position after such reeds have been molded above the reed plate. It is true, apparently, that the plaintiff does not use this feature, nor does the defendant. Nevertheless, I fail to see the merit in defendant's argument. Claim 2, which is relied on, makes no point of this feature. Claim 1, which is not relied on, does describe it. But the defendant makes no argument that claim 2 is limited by claim 1.

According to Richardson, claim 2 describes defendant's mold, and the mold described in that claim is the only basis here for accusing defendant's mold. The defendant did not dispute Richardson.

I now take up the question of validity.

In connection with patent '129, I believe a few preliminary remarks will be helpful in clarifying the issues.

In general, there is no invention in substituting one type of material for another in the construction of a device[2]; further, there is no invention in making integral that which was formerly of two or more parts.

It would follow, therefore, that generally it is not invention to construct a reed plate or reeds for a musical instrument of plastic material; or to make a reed plate with the reeds integral. It is problematical, then, wherein the invention lies in making, for example, "a reed plate formed of polystyrene and having a reed slot, and a reed having its heel end integrally connected to one side of said reed plate from a point at one end of said slot to a point beyond said slot end." (Claim 7 of '129.)

The prior art teaches that reeds for musical instruments were made of styrene before Magnus.[3] Richardson knew of such use of styrene and Scribner, one of plaintiff's witnesses, said that his own company had made clarinet reeds of styrene since 1940.

The prior art also discloses reed plates with integral reeds, all made of metal, however.[4]

Nevertheless, this prior art does not suggest a molded plastic reed plate with reeds integrally connected in form to vibrate in response to the passage of air.

It is stipulated in the pre-trial order that polystyrene was available in this country as early as 1934 and that other plastics suitable for injection molding and machines capable of such operation were available before 1930. Obviously, all the material necessary for the device disclosed by '129 was available as early as 1934.

The defendant company has been molding plastic articles since 1936–1937, yet it did not think to market a device having a plastic reed plate with integral reeds before March 1, 1947, almost two years

---

**2.** Cf. Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 1942, 124 F.2d 986, 987.

**3.** Among such patents are the following:

| | | |
|---|---|---|
| Arthur | 1,770,996 | July 22, 1930 |
| Maccaferri | 2,224,308 | December 10, 1940 |
| Caire | 2,230,993 | February 4, 1941 |
| Brilhart | 2,268,641 | January 6, 1942 |
| Maccaferri | 2,287,529 | June 23, 1942 |
| Peterson | 2,296,737 | September 22, 1942 |
| Nemcek | 2,318,515 | May 4, 1943 |
| Brilhart | 2,342,836 | February 29, 1944 |
| Brilhart | 2,374,579 | April 24, 1945 |
| Lucas | 2,375,934 | May 15, 1945 |

**4** 

| | | |
|---|---|---|
| Hammond | 33,143 | August 27, 1861 |
| Spethmann | 193,192 | July 17, 1877 |
| Bray | 242,811 | June 14, 1881 |
| Bray | 253,262 | February 7, 1882 |
| Bray | 280,789 | July 10, 1883 |
| Bray | 312,322 | February 17, 1885 |
| Bray | 416,897 | December 10, 1889 |
| Morgan | 417,069 | December 10, 1889 |
| Wojciechowski | 568,124 | September 22, 1896 |
| Stark | 615,112 | November 20, 1898 |
| Stark | 669,449 | March 5, 1901 |
| Soprani | 1,812,760 | June 30, 1931 |

after the plaintiff's product had been on the market.

Scribner and Post, both of the Boonton Molding Company, testified that their company had practiced plastic molding since 1921; had done injection molding since 1934; had started molding with polystyrene in 1938 and started molding clarinet reeds of polystyrene in 1940.

Post was consulted by Magnus in 1943 for possible production of his plastic reed plate in one piece. Magnus then displayed a hand-made model with the reeds glued on, but Post thought the project "entirely impractical." His decision reflected not only his own opinion but also the thoughts of Scribner, Davis and others of the Boonton Company. Scribner testified that he told Post that "we would not be able to make a mold out at a specified price because it was not a practical commercial proposition and we did not care to quote." Scribner said his company turned down the job.

Booth of Wallace and Tiernan Company, a concern manufacturing special engineering equipment, at least since 1926, also investigated Magnus' device and he reported to Tiernan that he did not think it was practical. At the time Tiernan was looking for projects in which to invest money.

I believe this evidence dispels the defendant's suggestion that the Magnus device was a simple proposition for anyone who put his mind to the prior art and considered the improvement in styrene. The Boonton Company, Wallace and Tiernan and the defendant itself made it a business to produce in plastic but evidently the Magnus device was not obvious to them.

■ Judge Learned Hand has said that "invention is always a function of the particular situation, of the conditions which preceded and followed the appearance of the composition or the machine." E. I. DuPont DeNemours & Co. v. Glidden, 2 Cir., 1933, 67 F.2d 392, 395. It is not to be measured against one's private notion that a novel device is an apparent and facile sequence of what preceded it. Hookless Fastener Co. v. G. E. Prentice Mfg. Co., 2 Cir., 1934, 68 F.2d 940.

Prior to Magnus, it was the general practice to make harmonica reed plates and the reeds of metal with slots formed in the plates. The reeds were then riveted on. It was necessary to hand tune each reed after attaching it to the plate. Apparently, these operations consumed so much time that it was unprofitable to manufacture a harmonica with metal reed plates and reeds in this country in competition with foreign products. There was virtually no harmonica industry in this country capable of supplying harmonicas in the low price field. Magnus' device created such an industry.

■■ It is a general rule that a presumption of validity attaches to the grant of a patent and can be overcome only by convincing evidence to the contrary. R.C. A. v. Radio Engineering Labs., 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453. And it was there stated that "one otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance." 293 U.S. at page 8, 54 S.Ct. at page 755.

■ I feel that the defendant has not overcome this burden in connection with the claims of patent '129.

■ I should say a few words about commercial success. While it is true that commercial success does not spell out invention where there is none "such success has weight in tipping the scales of judgment toward patentability." Jungersen v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 372, 93 L.Ed. 235; Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721. Plaintiff's venture started in 1945, apparently caught on and has been extremely successful. It will not be necessary for me to quote the figures because the thing that stands out in my mind is that as I have said before, plaintiff created a new industry. This, it seems to me, should be given weight here in passing on the validity of this patent.

It might be argued that much of this success was due to the fact that these harmonicas were made of plastic and could be

made cheaper thereby and that what sold the instrument was its attractive appearance, all due to its plastic make-up.

However, one must not forget the fact that without this reed plate there would be no harmonica.

The defendant contends that this case is controlled by Gelardin v. Revlon Products Corp., 2 Cir., 1948, 164 F.2d 910. There the invention disclosed a cosmetic holder composed wholly of plastic; the mechanism was "concededly old." The need for plastic arose because of the wartime unavailability of metal of which the holders were formerly composed. The plastic holder was an immediate success, but the success was limited to war years, and "the art repudiated the change as soon as metal returned." The Court, in holding the patent invalid, stated that there was "not the least basis for inferring that plastic would not have occurred to any competent person, who was looking for a substitute for metal in such a holder." 164 F.2d at page 911.

The distinction between Gelardin and the instant case is too obvious for discussion except that I may add that the art is far from repudiating the Magnus device.

I hold that claims 1, 2, 3, 5 and 7 of patent '129 are valid.

The defendant contends that the grant of its own patent on the Toymonica prima facie establishes no infringement citing Catalin Corp. of America v. Catalazuli Mfg. Co., 2 Cir., 1935, 79 F.2d 598. This undoubtedly follows from the presumption of validity accorded to patents, but it is clear from the evidence here that the plaintiff has shown infringement of '129.

Patent '312, however, stands in a different light. It was issued 17 months after '129 and in substance is the same thing except that it purports to be made in two parts. I say "purports" because it does not appear that Magnus uses this reed stick nor has he a mold to make one. Claims 4 and 5 of '312 generally describe a reed stick with integral reeds while the claims of '129 speak of the specific construction of the reeds to the plate. I believe that '312 is obvious after '129 and that it cannot be considered

invention. I hold that '312 was anticipated by '129.

Finally, the defendant contends that the construction of the mold of patent '451 is obvious, involves no invention and was not a conception or reduction to practice of Magnus.

Much of the defendant's argument under this phase has little merit.

For example, that Magnus is not the inventor of the mold but rather Hugg, the mechanic he employed, is; and that the invention was kept secret in accordance with the licensing agreement with the Harmonic Reed Company of Philadelphia.

I do not think anyone will deny that an inventor may employ a mechanic to assist him in applying his conceptions without making him even a co-inventor. And the fact that the features of the mold were a secret by agreement shows only the wisdom of parties in not disclosing something upon which a patent had not yet been issued.

There is merit, however, in defendant's total argument for I agree that there is no, invention.

Hugg, the plaintiff's mold maker, apparently first saw a mold of this type while he was employed by the Harmonic Reed Company of Philadelphia in 1943–44. It was a partially completed model which Magnus took to Philadelphia with him. Hugg and a mechanic from the Button Corporation helped Magnus to complete it. It was sent to Sterling Plastics Company for trial and it came back badly damaged. Meanwhile, Hugg working with Magnus, had completed a second model.

It is not true, therefore, that Hugg merely constructed a mold after seeing the model reed plate displayed by Magnus as the defendant intimates. He had Magnus' original mold and guidance to inspire him.

The plaintiff's expert, Richardson, said he had directed the design and supervised the construction of a great many molds in his career. He testified on cross-examination:

"Q. How many times did you visit the Magnus plant to examine their molds? A. Once.

"Q. And you were only there once and you saw between four and five molds at the time you were there, is that correct? A. That is correct.

"Q. And approximately when was the date when you visited the Magnus Harmonica Corporation to see the, molds? A. About a year ago.

"Q. And since then you have never gone back to see what Magnus mold looks like, have you? A. No, it hasn't been necessary.

"Q. Because your memory is pretty good over the course of a year? A. Not only my memory, but the reed plate itself show me how the mold is constructed.

\* \* \* \* \* \*

"Q. Now referring to Defendant's Exhibit C for identification, when you were given one of these reed plates a year ago to keep constantly in mind and in memory, assume that with your state of training a year ago you looked at that reed, could you design a mold 'to make the reed plate? A. I think so. I could have directed the design of it.

"Q. I did not hear the rest of the answer. A. I could have directed the design of it."

■ Now, if the reed plate itself shows Richardson how the mold is constructed, where is the invention? The answer is, there is none because 'the construction of the mold is obvious to anyone specializing in the field.

The defendant does not stress the prior art in connection with this mold, possibly because the Patent Office has allowed a much less intricate (to me, at least) mold than Magnus'. I have in mind McCoy, No. 2,266,887, December 23, 1941 which the Patent Office cited, along with Marinsky, No. 2,181,142, November 28, 1939, in allowing the Magnus patent. Even though I believe that the Magnus mold is more ingenious than McCoy, for example, I cannot bring myself to conceive of the Magnus device as invention in view of what Richardson stated.

It is no credit to Magnus' mold that Moessner, defendant's mold maker, "played around, maybe' two years" before he satisfactorily completed the defendant's mold. He may not have been as skilled as Hugg. And it is certainly no credit to Magnus' patent that Moessner was able, apparently without ever seeing Magnus' mold, to construct one which Richardson said reads on Magnus' claim 2.

I hold that claim 2 of patent '451 is invalid.

The defendant counterclaimed for unfair. competition but made no case of it except a showing that Magnus had sent a letter to the trade about an infringing device— possibly defendant's. On the evidence before me it is obvious that Magnus did not offend.

Settle judgment in accordance with the foregoing.

## Motions for Reconsideration.

On motion by the plaintiff and cross-motion by the defendant for reconsideration of certain holdings in the Court's opinion dated December 18, 1952.

Plaintiff suggests error in the determination of invalidity of Patents Nos. 2,407,312 and 2,416,451.

In holding Patent '312 invalid I said in part: "I believe that '312 is obvious after '129 and that it cannot be considered invention. I hold that '312 was anticipated by '129." [114 F.Supp. 947.]

Plaintiff directs attention to the fact that Magnus' applications for Patents Nos. 2,373,129 and 2,407,312 were copending in the Patent Office.

■ Plaintiff contends, therefore, that invention was not required in Patent '312 over Patent '129 since the latter was not part of the prior art. Plaintiff cites, among other cases, Traitel Marble Co. v. U. T. Hungerford, 2 Cir., 22 F.2d 259, which sustains its contention. Judge Learned Hand expressed the rule as follows: "Calkins' earlier patent was not part of the prior art, and it is not necessary to the validity of the claims in suit that they should embody a patentable advance over the earlier disclosure. The two applications were copending, and it is a matter of indifference

which of the patents issued first, provided that the claims are for separate inventions." Citing cases, 22 F.2d at page 260.

Undoubtedly, the claims of '129 and '312 are for separate invention. As stated in 114 F.Supp. 947, "Claims 4 and 5 of '312 generally describe a reed stick with integral reeds while the claims of '129 speak of the specific construction of the reeds to the plate."

Since, in my view, there was no reason other than what appears to be erroneous for invalidating Patent '312 I can only find it valid. Defendant's suggestion of double patenting is not persuasive. Although '129 may have disclosed '312, nevertheless the claims in the two patents are different and the inventions are separate. See Traitel Marble Co. v. U. T. Hungerford, supra, 22 F.2d at page 262; Western Electric Co. v. General Talking Pictures Corp., 2 Cir., 91 F.2d 922, 923, affirmed 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273. And further, even though plaintiff does not use the reed stick depicted in '312, its devices represent a combination of both '129 and '312.

I have considered plaintiff's arguments in connection with Patent '451 and defendant's arguments contained in its cross-motion and I feel that I should adhere to my previous determination.

As I have stated above I now feel I was in error in holding that claims 4 and 5 of Patent '312 were invalid for want of invention. Therefore, I now find in place and instead of the last paragraph of page 16 of my opinion the following:

Claims 4 and 5 of Patent 2,407,312 are valid over all of the art presented by defendant and while closely related to the disclosure of Patent 2,373,129, are valid thereover because Patents 2,373,129 and 2,407,312 were by the same inventor and were co-pending in the Patent Office.

I believe that the findings of fact and conclusions of law sufficiently appear in my opinion so that no formal findings and conclusions in addition to the opinion are necessary.

Settle order.