•26 C.C.P.A. (Patents)

**In re EARLE et al.**

**Patent Appeal No. 4074.**

Court of Customs and Patent Appeals.
March 6, 1939.

GARRETT, Presiding Judge, and BLAND, Associate Judge, dissenting in part.

Brown, Jackson, Boettcher & Dienner, of Chicago, Ill. (John A. Dienner and Robert R. Lockwood, both of Chicago, Ill., of counsel), for appellants.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

The application for patent, serial No. 72,734, here involved relates to lightning arresters for use in electrical power transmission systems. It was filed in the United States Patent Office April 4, 1936, as a continuation of a prior application, serial No. 716,244, filed March 19, 1934. Eighteen claims were presented. All were denied by the examiner as being non-patentable in view of prior art cited, and his decision was affirmed by the Board of Appeals. From the decision of the latter the instant appeal to this court was taken. At the hearing before us the appeal was withdrawn as to claims 1 to 15, inclusive, so that only three claims, 16, 17, and 18 require consideration here.

Claim 16 is illustrative. It reads: "16. In a lightning arrester for an alternating current power transmission line operating at a power frequency of 60 cycles or less, in combination, a spark gap assembly, a pair of spaced apart electrodes, a mass of electric valve material interposed therebetween, said spark gap assembly being connected in series circuit relation with said electrodes and valve material and the combination being disposed to be connected between said line and ground, and a glass housing having relatively thick walls surrounding said spark gap assembly and said valve material which permits light rays emanating from the interior thereof to be visible from substantially any point around the lightning arrester and which permits a visual inspection to determine the existence

of any variations from the normal condition thereof."

Numerous references were cited. Some of these related particularly to those claims as to which the appeal has been withdrawn and may now be disregarded. The references applicable to the three claims remaining are the following patents: Reid, 1,311,-916, August 5, 1919; Dryden, 1,359,971, November 23, 1920; McFarlin, 1,923,943, August 22, 1933; Beckett et al., 1,947,076, February 13, 1934.

In the brief for appellants there is set forth a general statement respecting lightning arresters, their function and operation, and it is said that prior to the production of the devices at issue, it had been the custom to enclose the "spark gap assembly and a mass of valve material interposed between a pair of plate-like electrodes" in opaque housings. The brief states: "Accordingly, appellants' invention resides in the substitution of a transparent housing, composed of glass, for the opaque housing, composed of porcelain, of the prior art for enclosing the spark gap assembly and valve material of an electric power line lightning arrester, thereby permitting visual inspection of the interior condition of the same from any point around the lightning arrester when it is installed on a transmission line tower or pole, or prior to installation. * * *"

It may be said that in exhibits of appellants' devices brought to our attention at the hearing the housing was composed of glass, and in prior art exhibits it was composed of porcelain.

The disclosures of the references pertinent to claims 16, 17, and 18 are stated in the examiner's decision in the following language:

"The general type [of] arrester shown by applicant is shown by McFarlin and Beckett both of which use valve material with a series multiple gap. The casings however are of porcelain and visual inspection of the interior thereof or of the operation of the device is not possible. The examiner can see no invention in making the casings of these references of glass to permit inspection. Ex parte Onderdank, 260 O.G. 561. This involves merely a change of material to secure an expected and known result and is not patentable. In re Schoenrock, 59 F.2d 235, 424 O.G. 329. The casings of Beckett and McFarlin both have ribs for various purposes and if of glass these ribs would inherently act as lenses to the same extent as applicants'.

"The use of glass for insulators is old and well known. Applicants' glass casing is no thicker than the prior art porcelain ones.

"Claims 1, 2, 3, and 7 to 18 were accordingly rejected on McFarlin or Beckett.

"Since Reid and Dryden teach the use of glass windows to permit inspection, the examiner can see no invention in providing windows or making of glass any casing to permit inspection of the interior."

From the foregoing it will be seen that the Dryden and Reid patents were cited particularly because of their showing a "window" of transparent material in the housing through which inspection of the arresting mechanism may be made. Of these patents the board said: "Without a doubt the Dryden and Reid patents disclose arresters which can be inspected from the outside. It is of course necessary to look into the arrester from a point opposite the window. If the entire casing is made of transparent material, the interior could be inspected from all sides. However, this is merely carrying forward an old idea and does not appear to involve invention. It is further quite common in many arts to enclose the vital parts of an apparatus within a transparent casing so that the interior mechanism may be inspected from all sides. Numerous examples of this can be given such as clocks, electric meters, etc. From this we think it would be obvious to make the entire casings in McFarlin and Becket et al. of a transparent material so that the interior can be inspected from all sides. Particularly is this true because it is broadly old to provide windows on a lightning arrester for this purpose."

It is not seriously contended before us that the arrester mechanism of appellants enclosed in the housing, as described in claims 16, 17, and 18, contains any features not shown by the prior art, and the elemental issue in the case is whether invention was involved in making housings wholly of glass (or other transparent materials) instead of opaque material, such as porcelain, especially in view of the showing with respect to windows in the opaque housings.

During the progress of the case in the Patent Office appellants presented affidavits relating to advantages derived from the use of the transparent housings. For ex-

ample, it is shown to be possible for one inspecting an electrical 'power line equipped with glass-housed arresters to detect any collapse of the arresters from the ground and without the necessity of climbing the poles carrying the wires. Formerly, it seems it would have been necessary to climb the poles even where the housings were equipped with windows in order to obtain a view of the arresting equipment, and in cases where there were no windows it seems to have been necessary to disconnect the devices and carry them to some place for testing. One affidavit relates to commercial success.

We will first consider claim 16, which provides for a glass housing which permits light rays emanating from the arrester to be visible from substantially any point around the same.

Counsel for appellants concede the rule to be that substitution of one material for another usually does not involve invention, but it is pointed out that there are exceptions to the rule, and various decided cases are cited in which the exceptions were applied.

With respect to such questions the general rule is stated in the case of Hicks v. Kelsey, 18 Wall. 670, 673, 21 L.Ed. 852, wherein the court stated: "* * * The use of one material instead of another in constructing a known machine is, in most cases, so obviously a matter of mere mechanical judgment, and not of invention, that it cannot be called an invention, unless some new and useful result, an increase of efficiency, or a decided saving in the operation, is clearly attained. * * *"

Upon this same point the Circuit Court of Appeals, Third Circuit, in the case of Low et al. v. McMaster, 266 F. 518, 519, stated: "On this subject it is the law, that merely to substitute superior for inferior materials, in making one or more or all of the parts of a machine or manufacture, is not invention, although the substitution may be of materials that are both new and useful in high degree. It is also the law, as exceptions to this general rule, that if the substitution involved a new mode of construction; or if it developed new properties and uses of the article made; or where it produces a new mode of operation, or results in a new function; or when it is the first practical success in the art in which the substitution is made; or where the practice shows its superiority to consist not only in greater cheapness and greater utility, but also in more efficient action, it may amount to invention. [Citing cases.]"

In the case of Van Heusen Products, Inc., et al. v. Earl & Wilson, 300 F. 922, 929, the District Court, Second District, N. Y., stated: "I am faced with the usual collection of cases to prove that it is never invention to substitute one material for another. * * * I do not conceive that the law has ever laid down any such absolute rule on this subject, or any other absolutes for that matter. The prospect of getting objective tests for invention is tempting, but it is a mirage. How is it possible to say a priori what combination of elements needs an original twist of the mind, and what is within the compass of the ordinary clod? Is it not clear that the quality of a man's inventiveness must be tested by reconstituting the situation as it was in the light of the preceding history of the art? There is no vade mecum for such inquiries. Our unknown ancestor, who first substituted iron for bronze in the head of an ax, was the bright exemplar of all inventors to come. Yet it was not an invention, if one is bound by this objective test. In this subject the standard escapes any abstract definition, because the end in view needs nicer adaptations, as in the cases of due care or notice. The defect of such a standard is indeed its uncertainty, but certainty is only one of the ends of law."

In the case at bar, while it may be said that the substitution of glass for porcelain as the housing for a lightning arrester does not per se affect its operation, it is true that the glass housing has a new property not possessed by the porcelain housing; viz., rendering visible at a distance the operative condition of the arrester. With the glass housing the condition of the arrester may be observed from the ground, while all of the arresters shown in the cited art required, for such observation, the climbing of the pole or tower on which they were placed, and even then, according to statements contained in appellants' application, it was often necessary to disconnect a large number of arresters and test them in order to determine which arrester was in an inoperative condition. An affidavit in the record states that the operative condition of appellants' glass housing arrester may be observed from the ground, while the inspector is in an automobile upon the highway, the pole upon which the arrester is

placed being some fifty feet from the traveled portion of the highway.

■ It is our opinion that this additional property of the glass housing brings appellants' device within an exception to the general rule regarding substitution of material. The question remains, however, whether, in view of the cited references, the substitution of glass for the porcelain housing of the prior art required the exercise of the inventive faculty.

It is true that the patents to Dryden and Reid disclose arresters having small glass windows aligned with the spark gap assembly, and that by aligning oneself with the aperture it is possible to inspect a portion of the interior of the arrester. However, in order to do so, it would be necessary for the inspector to climb the pole or tower. It was the view of the Board of Appeals that to make the entire housing of glass was merely carrying forward an old idea and did not involve invention.

This question is a close one, but we think appellants have greatly advanced the art of lightning arresters and have effected great savings to their users. It does not seem to us that any of the cited references suggest a glass housing rendering the operative condition of the arresters visible at a considerable distance. At least we think there is such reasonable doubt upon this question that it should be resolved in favor of appellants, and we so hold.

Of course, when the idea was once conceived of rendering the operative condition of the arrester visible at a distance, the use of a glass housing for that purpose was obvious; but a part of the inventive concept was the idea of rendering the operative condition of the arrester so visible. In the case of Rosemary Mfg. Co. v. Halifax Cotton Mills, Inc., 4 Cir., 257 F. 321, 322, it was stated: "In many inventions there are two distinct steps: First, the conception of the general result wished for; second, the discovery of a way of obtaining it. In a large majority of cases, perhaps, the first may be obvious to every one interested in a particular art, and it is the second which calls for the exercise of inventive genius. But that is not always so. It may well be that two or more machines, appliances, or tools are old and well known. Some day it dawns on some one that, if they are combined, new and useful results will be obtained. It may be that, so soon as the advantages of the combination are understood, the means of bringing it about are within the capacity of any fairly skilled mechanic. In a third class of cases inventive genius may be required both in perceiving the combination that is desirable, and in finding out a practical way of making it."

So here a part of the inventive concept was the idea of rendering visible at a distance the operative condition of a lightning arrester, and when a glass housing was utilized for that purpose the invention became complete, and it is immaterial that the use of glass to complete the invention would be obvious to one who had formed such original concept.

■ Claims 17 and 18 differ from claim 16 in that it is required that only a portion of the housing shall be of glass. This is not, in our opinion, a sufficient departure from the disclosures of Dryden and Reid to constitute invention. We think the claims would be fully met by merely extending the windows disclosed by said references, and that in order to inspect the arrester with such a housing it would still be necessary to climb the pole or tower upon which it is placed. For this reason we hold that claims 17 and 18 are not allowable.

The appeal is dismissed as to claims 1 to 15, inclusive, affirmed as to claims 17 and 18, and reversed as to claim 16.

Modified.

GARRETT, Presiding Judge, and BLAND, Judge, dissent as to claim 16.

HATFIELD, Associate Judge (specially concurring).

I am unable to agree with the views expressed in the majority opinion that the question of substitution of materials can be divorced from the question of invention. Considering the facts and circumstances of record, I think appellant has done something more than merely substitute a transparent housing, such as glass, for an opaque housing, such as porcelain.