### GELARDIN v. REVLON PRODUCTS CORPORATION et al.

No. 104, Docket 20787.

Circuit Court of Appeals, Second Circuit.

Jan. 7, 1948.

Thomas J. Byrne and Frederick Griswold, both of New York City, for appellant.

---

[3] 31 C.J.S., "Estoppel," § 67.

[4] Ibid, § 87.

[5] Ibid, § 109.

W. Lee Helms, of New York City, for Revlon Products Corporation.

Asher Blum and Mack & Blum, all of New York City, for Advertising Arts Corporation.

Before L. HAND, SWAN and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment, dismissing the complaint in a patent infringement action because of the invalidity of the patent—No. 2,318,152. The primary object of the invention is to disclose "a cosmetic holder, all parts of which are wholly composed of plastic material"; and the mechanism disclosed was, in general, concededly old: that is to say: "a cosmetic holder in which the carrier for the cosmetic is advanced by the relative rotation of two slotted members." However, no such holder had theretofore been made wholly of plastic; and hence the claims. It would serve no purpose verbally to describe the disclosure in detail, or that of Patent No. 2,104,902, issued to Morrison, on January 11, 1938, upon which the judge particularly relied to invalidate the patent in suit. The parallelism between the two cannot be satisfactorily shown without the figures; and we are obliged to assume a familiarity with these in our discussion. We shall consider the issue of validity in two aspects: (1) whether it was an invention to change from metal to plastic; (2) whether, if not, Gelardin's modifications of Morrison's disclosure can support his patent.

It has at times been said that a change in material can never of itself be invention; but, if that be taken as an absolute, it is not true. Invention is the act of putting together elements—all usually old —which gives them an added value; and the combination must be one for which exceptional imaginative talent is necessary. How exceptional this must be is another matter; but it would be as absurd to maintain that the substitution of a new material can never require originality, as that it could never make a profitable advance.[1] We shall therefore assume that the change from metal to plastic might support the patent. The difficulty is that in the case at bar there is no reason to suspect that it did. Although metal had been always used in making such holders before the last war, by the end of 1940 it became plain that it would soon become unavailable. In the words of one of the plaintiff's witnesses: "We eventually would completely lose metal." Under the spur of this Gelardin set about finding a substitute, and began experimenting in plastics, in which he had been already a worker as he had been in metals. He testified that he completed his invention in about three months, and he filed his application during the following summer. The holder went into very wide sales, about 22,500,000 in five years; although that is not as significant as at first blush might appear, for 150,000,000 are sold every year. Furthermore, this success was limited to the war years and the year following; for the uncontradicted testimony was that by the autumn of 1946 the art had "all gone back to the metal case, to the extreme limit of the possibilities of securing them." (sic) Let us then sum up the facts. The need had hardly arisen before it was supplied; there had been no history of earlier unsuccessful efforts; the art repudiated the change as soon as metal returned. Moreover, although there had never been an all plastic holder, there had been at least one partly made of plastic; and that material was already in use for kindred purposes. (Gelardin himself had been making flashlights of metal and plastic, apparently interchangeably.) There seems to us in all of this not the least basis for inferring that plastic would not have occurred to any competent person, who was looking for a substitute for metal in such a holder. If the disclosure was patentable at all, it was because of the structural changes devised.

[1] Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 23 L.Ed. 952; Potts v. Creager, 155 U.S. 597, 608, 15 S.Ct. 194, 39 L.Ed. 275; Low v. McMaster, 3 Cir., 266 F. 518, 519; Yablick v. Protecto Safety Appliance Corporation, 3 Cir., 21 F.2d 885, 887; In re Earle, 102 F.2d 232, 234, 26 C.C.P.A. (Patents), 974; Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 124 F.2d 986, 987; Grant Paper Box Co. v. Russell Box Co., 1 Cir., 154 F.2d 729, 730; Lincoln Stores, Inc. v. Nashua Mfg. Co., 1 Cir., 157 F.2d 154, 159.

There had been a long prior art in such holders with various approaches in detail to Gelardin's disclosure, but we shall disregard it, because Morrison, the last and closest, left nothing to be done which was not involved in, or readily deducible from, the substitution of plastic for metal. The only significant structural differences between that patent and Gelardin are two. (1) Gelardin made the "intermediate sleeve, 23" in which was mounted the "carrier, 15," unitary with the "disc-like bottom, 8." Instead of this, Morrison fastened the "guide tube, 4" to the "operating head, 5" by making the inside of the head "cup-shaped," and the lower end of the "guide tube" flare outwardly. As the "guide tube" was pushed down into the "head," the sides of the "head" caused the end to be bent outwardly and to look under an undercut, or "annular bearing," running along the inside of the "head." This action would be promoted, if the lower edge of the "guide tube" was cut into teeth. In either event the two members were united functionally. (2) Gelardin put the "helical groove, 21" on the inside surface of a "sleeve, 23," which was required to be "relatively thick-walled." Morrison divided this member into two parts, one of which was an "exterior casing, 12" which was turned inwardly at the top, and had a "bead, 12b," at the bottom, with vertical "slots, 12c." Within this "casing" he inserted the "propelling sleeve, 8," containing a "helical slot, 9." This "sleeve" was made out of a flat piece, rolled "into the sleeve." It was of such width that "when it is rolled into the sleeve the edges do not meet, but leave the vertical end-to-end slot, 10." The "casing" and "sleeve" were locked against mutual rotation by "an indentation, 13," which protruded inwardly from the "casing" into the "slot, 10." They were kept from longitudinal separation by the upper "flange, 12a," and were functionally a single member. The "casing" was held against separating from the "operating head, 5," by the inturned "bead, 5d" on the "head" which engaged the "bead, 12b," on the "casing." The "slots, 12c" allowed the "casing" to be pressed into the "head" until the beads engaged. Unlike Gelardin the two rotating members could be disengaged. We can see no other differences that are not too trivial to demand discussion.

The second of these was a mere convenience in manufacture. It was much easier, when working in metal, to fabricate a flat sheet with a diagonal slot, and roll it into a cylinder to be inserted into a cylindrical outer casing, than to make a "relatively thick-walled outer sleeve" with "an internal helical groove." When working in plastic, there are no manufacturing difficulties in moulding the helical groove on the inside of the "sleeve," provided that be made thick enough. As to the first difference, we assume that we must take it that it would have been impossible, when working in plastic, to lock Morrison's "guide tube, 4" to his "operating head, 5" by turning up its lower edge within the "head," as Morrison disclosed. There is no contradiction of Hammer's testimony that "the chances are that they" (the teeth) "would all break off." Be it so, it does not seem to us possible that, if a worker in plastic found this to be true when he followed Morrison's disclosure, he would have been checked by his inability by some other means to lock together the "guide post, 4" and the "operating head, 5." The very fact that he was dealing in plastic would suggest to him that the two members could be moulded as one. The testimony upon this is uncontradicted. Gelardin himself conceded that it had been known for "a good many years" that a moulder in plastic "could make in one piece what in metal required two pieces to be joined together." And Brunhaber, Gelardin's plastic fabricator, testified that if he were faced with a metal article "made in several pieces" which was to be reproduced in plastic, he would try to make it into "one piece, if it is possible"; for that was "one of the advantages of using plastic." A priori, we cannot therefore regard the first of the two changes as demanding more than the common knowledge of the art.

Thus it appears that, once metal became scarce, resort to plastic was almost inevitable; and that once resort was had to plastic, the art needed nothing more to guide it than Morrison. Even so, a vast success might make plausible the case for invention; but here there was not any such

success. On this record the success, which even in its day was no more than sizable, was ephemeral—a flash in the pan—extinguished as soon as the transitory occasion for its emergence disappeared. The examiner had steadily refused to allow any claims in the face of Morrison, until two were added which emphasized the thickness of the walls of the outer sleeve; and he then yielded only after one of those personal interviews which are so often successful. What arguments were used we cannot know; but it is easy to understand how the obsessive persistence of a skillful solicitor might overcome the examiner's doubts. After all, he might have reasoned, it was not unfair to yield, if he was in genuine doubt. At least that gave the applicant his only chance, and the public would have the protection of an equally interested opponent to present the other side. We agree with the judge that the patent is invalid for lack of invention over Morrison; indeed, more plainly so than any other that has come before us for some time.

Judgment affirmed.