FALCON INDUSTRIES, Inc., an Indiana corporation, and Diversey Machine Works, Inc., an Illinois corporation, Plaintiffs,

v.

R. S. HERBERT CO., Inc., a New York corporation, Continental Briar Pipe Co., Inc., a New York corporation, Jerome Gevirman, individually and as an officer of the defendants R. S. Herbert Co., Inc. and Continental Briar Pipe Co., Inc., and Max Rubin, individually and as an officer of the defendants R. S. Herbert Co., Inc. and Continental Briar Pipe Co., Inc., Henry, Leonard & Thomas, Inc., a New York corporation, and Henry Lavietes, as an officer of Henry, Leonard & Thomas, Inc., Defendants.

Civ. No. 14128.

United States District Court, E. D. New York.

Feb. 4, 1955.

See also 15 F.R.D. 394.

Alexander, Maltitz, Derenberg & Daniels, New York City, Louis Kunin, New York City, Howard W. Hodgkins, and Howard Koven, Chicago, Ill., of counsel, for plaintiffs.

Abraham Nydick, New York City, W. Lee Helms, New York City, of counsel, for defendants.

BYERS, District Judge.

The plaintiffs seek an injunction and damages by reason of alleged unfair competition and the alleged infringement of a design patent and of a mechanical patent owned by the first named plaintiff, to be called Falcon.

The plaintiffs are corporations of Indiana and Illinois, respectively. The three corporate defendants are R. S. Herbert Co., Inc., to be called Herbert; Continental Briar Pipe Co., Inc., to be called Continental; and Henry, Leonard & Thomas, Inc., to be called Henry. They are all New York corporations. The individual defendants are either residents of New York State or non-residents of either State in which the plaintiff corporations were organized.

It appears that Falcon manufactures the Falcon pipe involved in this litigation, and that Diversey Machine, Works Inc. is the exclusive selling agent thereof.

The respective roles of the corporate defendants are not made clear in the record but it is thought that Herbert is the manufacturer now of the pipe presently called the Viking, which is the subject of the plaintiffs' attack. The Continental perhaps started that manufacture but is now inactive, having leased its machinery and equipment to Herbert. Henry is the exclusive selling agent of either or both of the other corporate defendants.

This decision will proceed upon that understanding which can be corrected at the foot of the opinion if a mistake has been made.

For convenience, reference hereinafter to the plaintiff will mean Falcon, and to the defendant will mean Herbert, for essentially the contest seems to be between those parties.

The causes will be considered in the order in which they are pleaded.

First: Alleged Unfair Competition

It should be said that the competing articles are tobacco pipes which closely resemble each other in general appearance and configuration. A side by side comparison and examination will reveal differences in details of construction but the testimony shows that uninstructed persons looking at the defendant's product would assume that it was but a modified version of the Falcon pipe.

The evidence to support that statement will be referred to in connection with the Findings which, to avoid duplication, will be stated in this opinion:

Findings as to Unfair Competition

1. On the question of priority, the plaintiff's product was put upon the mar-

ket in 1947 and the exclusive selling arrangement was made with Diversey in September, 1948.

2. The sales in dollars of the Falcon pipe during the ensuing years through 1953, when defendant's product was first sold, are shown to have been:

| | |
|---|---|
| 1949 | $160,000. |
| 1950 | 231,000. |
| 1951 | 322,000. |
| 1952 | 547,000. |
| 1953 | 780,000. |

3. Until the defendant's pipe was placed on sale, the Falcon was the only pipe which had ever combined a removable briar bowl screwed into a supporting metal (aluminum) cup-shaped basin from which extended, laterally to the mouthpiece or bit, two integral metal (aluminum) side supporting members and a third element, namely, an exposed central metal (aluminum) tube through which smoke passed from the basin supporting the briar bowl, to the bit; from the latter the smoke entered the mouth of the user of the pipe.

4. The side supporting members were in effect parallel extended portions of the cup-shaped basin about 5/16 of an inch apart and did not merge until at a distance of about ½ an inch from the bit where they were bridged or molded so as to constitute a continuous unit, commencing as extensions of the basin and ending at the bit.

5. The Falcon pipe was individual, unique, and entirely original in appearance, namely, there had never been any pipe on the market with an aluminum metal shank with three parallel bars connecting the tobacco burning element with the bit.

The word "Falcon" was legibly impressed into the flat surface where the side supporting members merge into the bottom of the cup-shaped basin.

6. Consumer acceptance as shown in the dollar volume of sales during the five year period mentioned, since there was no competing device on the market, was consistent with identification in the minds of pipe smokers of the plaintiff's device as a product apart from pipes entirely of briar construction; the Falcon pipe has created its own individual place in the field of tobacco smoking devices.

7. The plaintiff spent $265,000 from 1949 through 1954 (9 months) in advertising and promoting the sale of the Falcon pipe. The figure for 1949 was $9,000, and for the first nine months of 1954 it was $41,000.

8. The pipes of both parties have been mounted upon cardboard easels for display on counters and shelves of distributors. The defendant's easels were later in time than the plaintiff's and are of the same general appearance.

### Points of resemblance are

(a) Color scheme: Both employed the same shade of red and yellow, the part supporting the pipes being red in the plaintiff's easel and yellow in the defendant's; black lettering is used in both, with white background effect more extensive in the defendant's easel than in plaintiff's;

(b) By prominent illustration both easels emphatically call attention to the drops of moisture resulting from the burning of tobacco in the bowl (although in both the tobacco is absent) which fall into the cup-shaped bowl holder below the aperture connecting the central metal tube with the metal holder, to indicate that the smoke going through the tube loses much of the moisture content or residue of the smoking operation. The residue of ashes and moisture in this case is called the concentrate.

That asserted result was one of the important selling points exploited by the plaintiff's easel and was pictorially overemphasized in the illustration showing a section of the briar bowl detached from the bowl holder to depict the operation above described. The plaintiff's illustration is almost grotesque in exaggeration, and that exaggeration is reproduced in the defendant's easel in such simulation of the plaintiff's illustration,

as to refute any possible suggestion of coincidence.

### Comment

In making this Finding, the court has not overlooked Defendants' Exhibits C, D and E.

(c) Both easels emphasize in printed form that the briar bowls are interchangeable and that the user of the pipe will experience a cool, dry smoke and that the bowl is dry, but the reading matter differs as to the color scheme, size of type and form. Both call attention to the lightness of the metal stem, the plaintiff's statement being "Weight one ounce", and the defendant's "It's light."

### Points of difference are

(a) The plaintiff's pipe is priced at $3.50 while the defendant's is $1.95;

(b) The plaintiff's easel contains a pictorial representation of a cross-section of the bowl and holder, containing tobacco being consumed, and is intended to show the trapping of concentrate, while there is no such illustration in the defendant's easel.

### Comment

A comparison of the easels would not sustain a finding of complete simulation by the defendant of this form of the plaintiff's advertising; however, the overall effect, if resulting from an unstudied and separate observation of the two, would reveal more of resemblance than of difference, since the color scheme and the general presentation are indeed similar.

This aspect of the case is not of sufficient weight to sustain the plaintiff's cause but it is an important element of the case as a whole.

9. Actual confusion on the part of pipe smokers between these competing products has been established by the evidence.

### Comment

The depositions of nine witnesses have been received in evidence, all of whom were interviewed in the course of the taking of a poll at the Motor Boat Show and the Automobile Show in Chicago in 1954 by an agency employed for that purpose. The upshot of those depositions, each witness having been cross-examined, is that they can see the differences between the Falcon pipe and the defendant's product as the result of comparison, but upon first looking at the latter only, they thought either that it was a Falcon pipe or a newer model of it. (Snowden, for instance, said: " * * * I thought it was a reversion of the Falcon.")

The following may be quoted from the witness Muszinski:

" * * * I can probably tell a good pipe from a poor pipe by the finish of the bowl, the briar, but on a pipe of this nature where it has a metal design, I presume for the purpose of cooling and trapping tobacco juice, the two are similar in design to me. I am not a connoisseur of pipes."

The plaintiff's witness at the trial, Morstadt, testified to the same effect.

10. Evidence of confusion on the part of distributors and consumers clearly appears in the record, and without contradictory testimony.

### Comment

One manifestation of the confusion on the part of distributors and consumers consists in the number of the defendant's frames and bowls which were returned by both, to plaintiff's selling agent for the purpose of repair or replacement of parts; additionally, the physical exhibits include:

32 defendant's Viking frames (18 of which do not bear the name Viking, and 18 of which have bowls attached);

19 separate Viking bowls; and

7 Falcon frames with Viking bowls affixed.

Also there were received by Diversey over thirty letters from distributors and consumers requesting repair or replacement of the defendant's pipe (Plaintiff's Exhibits 10–13).

A quotation may be permitted from Plaintiffs' Exhibit NN, written September 2, 1954:

> "You see, I don't even know where the 'Viking' concern is. I would not have known about yours either, only thru an 'ad' in the Saturday Evening Post. * * * All I can say is, that the Viking pipe must be a pretty clever imitation, as they look alike to me."

There are two instances of an advertiser being confused, namely, on January 17, 1954 and May 16, 1954 the Cunningham Drug Stores, Inc., a retail organization operating in Michigan, ran advertisements of "Falcon" pipes in the Detroit Free Press and The Detroit News, well-known newspapers; the advertisements displayed a picture of the *Viking* pipe.

Two instances of the sale of defendant's pipes to customers by a retail dealer occurred in the store of Wally Frank Inc., corner of Fulton and Nassau Streets, Manhattan, when two purchasers requested Falcon pipes, one specifying "a Falcon pipe with the metal shank" and in both instances a pipe of defendant's manufacture but without a name, was sold to the customer.

The failure of the defendant to impress or stamp any name on the pipes that it marketed to identify them, which failure persisted over an indefinite time between June 1953, when marketing by the defendant began, and July 1954, was consistent with the purpose to conceal the competitive nature of these products.

The testimony for the defendant on the subject of putting the name "Viking" upon its pipes is vague and unsatisfactory. An initial purpose to compete with the plaintiff in an open and candid attempt to wrest from the plaintiff some or all of the market it had created and developed over a period of five years, namely, a distribution of this particular product, would have been reflected in part by the adoption and exploitation of a trade-name or symbol calculated to create for the defendant's product an identity of its own.

The extent to which the anonymous character of the defendant's product contributed to confusion is shown in the return to plaintiff of eighteen of the defendant's pipes for replacement as above stated.

Moreover the marking as shown on Plaintiffs' Exhibit 7A, 7B and 7C is not comparable in clarity to that produced by the plaintiff.

Recent magazine advertising by the defendant is consistent with the recognition of the expediency of calling attention to the Viking pipe as such and reflects a change in tactics from whatever cause that change may have proceeded.

11. The plaintiff's Falcon pipe as of the date of the filing of the complaint, February 8, 1954, had acquired such an identity as a tobacco pipe that purchasers and distributors were likely to believe, and in many instances did believe, that the defendant's Viking pipe came from the same source as the plaintiff's Falcon pipe.

#### Comment

This finding is based not only upon the testimony above referred to but, as to the likelihood of confusion, upon opinions expressed by witnesses whose familiarity with the trade and its development is unchallenged; even the defendant's opinion witness, Bell, said on direct: " * * * One individual who knows quite a lot about pipes and would inspect them carefully, he would not be confused, I don't believe. The casual buyer perhaps might."

#### Conclusion of Law

I. The plaintiff's Falcon pipe has acquired a secondary meaning whereby its identity has been established, and that it is of the plaintiff's manufacture; and the defendant has been guilty of unfair competition in the manufacture and sale of the Viking pipe.

Second: Plaintiff's Design Patent

Upon application filed April 21, 1945 "Design Patent for a Smoker's Pipe"

Des. 142,280 was granted for fourteen years to Bugg, plaintiff's assignor.

The single claim is: "The ornamental design for a smoker's pipe, substantially as shown (in the drawing)."

Also, and to be discussed later, the same applicant filed on May 19, 1945 for a mechanical patent continued in part by application filed May 8, 1947, which ripened into patent No. 2,581,169, granted January 1, 1952. That circumstance is somewhat involved with this branch of the case as is disclosed in part of defendant's argument against the validity of the design patent.

In view of the numerous decisions unfavorable to design patents, it may be permitted to quote from the statute which authorizes their grant:

Tit. 35 U.S.C. § 171:

"Patents for designs

"Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.

"The provisions of this title relating to patents for invention shall apply to patents for designs, except as otherwise provided."

This is the statute in its present form, which introduced no change of substance in the earlier law under which most of the cited decisions were rendered.

It was said in Briddell v. Alglobe, etc., 2 Cir., 194 F.2d 416, at page 419:

"To obtain a valid design patent is exceedingly difficult."

The same view is stated in Tourneau v. Tishman, D.C., 119 F.Supp. 593, affirmed on opinion below, 2 Cir., 211 F.2d 240.

Neither opinion says bluntly that there is a presumption against validity (which would have been inappropriate in the first case since no design patent had been procured by that plaintiff), but the judicial attitude concerning design patents almost seems to go so far. The caveat thus exposed must of necessity guide, if not constrain, the present attempt at adjudication.

The plaintiff's pipe is of course an article of manufacture and thus within the purpose of the statute. If authority be needed for that statement, see Application of Park, 181 F.2d 255, 37 C.C.P.A., Patents, 1021.

Whether in design the Falcon pipe is new, original and ornamental is the next subject of inquiry. As to whether it is new and original depends upon the extent to which the art knew of such a design, that is, whether invention may be attributed to the conception itself.

Whether it is also ornamental of course invokes that proverbial subjective test which somewhat enlists the eye of the beholder.

To deal with the requirement first stated, it will be convenient to examine the defendant's arguments intended to demonstrate invalidity. It is to be observed that the action of the Patent Office as shown in the file wrapper, discloses three references cited as illustrating the state of the prior art; and since the Bugg application was granted, it is obvious that the Office regarded the Bugg disclosure as patentable over each of the references. Consideration of the patents so listed by the Office here in evidence, vindicates the action taken. Nor does the defendant argue to the contrary, but defines its attack to other patents about to be discussed.

### Defendant's Citations

Silber, U. S. Patent 2,236,076 (March 25, 1941), Ryberg, Swedish Patent 57,-501 (1923) and Fritz, U. S. Patent 165,-814 (1875) are all mechanical patents, and it is urged that their respective disclosures are sufficient to deprive Bugg of the showing of invention necessary to sustain his design patent.

The argument fails since none of the cited patents reveals a design—the novel embodiment of elements organized in pleasing or artistic form—even remotely

resembling the Falcon pipe or the drawing.

Neither Silber, Ryberg nor Fritz portray a shank in the form presented by Bugg, namely, a three element member:

Silber's no shank pipe shows the shank to be a unitary element; Ryberg shows the same, although the top of his shank is hollow for most of its length to hold a detachable metal tube; one end of that is thrust into the bit and the other into the bowl, the object being to provide a pipe with a tube in which the smoke is conducted from the bowl to the bit; the shank acts as an underneath support, leaving the top exposed to the air to secure a cooling result. The opening in the top of the stem, according to the patent, "may also be replaced by several smaller openings, without substantial change of the invention."

The defendant's argument is thus stated: "Bugg sliced away the top of his shank exactly as shown by Ryberg," which slicing by a long oval cut at the bottom of the shank, is purely functional.

The truth is that Bugg sliced away nothing, while Ryberg did. The latter started with the conventional briar pipe shank which of course extended to the bit, and then cut away the top of the shank for the double purpose which has been explained. There was nothing ornamental about the Ryberg pipe, and it may even be doubted that it was ever useful.

Bugg, so far from slicing away part of the shank of the pipe, designed an entirely new and original form of construction of that member which was not integral with the briar bowl, but with a different element of the structure into which the bowl is screwed. The plaintiff's design was not an improvement upon Ryberg, but embodied a different concept of shank construction which happens also to be ornamental in appearance.

Perhaps it is trite to observe that the defendant did not choose to imitate Ryberg or to adopt the latter's design in whole or in part.

The Fritz patent is for an improvement in pipe stems, namely, a double pipe stem consisting of an exterior and interior stem; the former could be of wood, slotted longitudinally nearly from one end to the other. The interior stem could be of "thin tin, German silver, or any other kind of metal or material that will cool off suddenly."

The openings provided for as above stated are said to supply the deficiency of inside exposure of the inner stem, which Ryberg failed to teach. It is obvious to this court at least, that the pipe stem as Fritz conceived it did not lie in the path which led Bugg to the expression of his concept of an ornamental pipe shank.

Somewhat as in Park, supra [181 F.2d 256], so here:

"A comparison of the drawings of appellant's application with the drawings of the cited references shows that appellant's pipe bowl is quite different from the golf club head of each of the references. This is true when viewed from any side or angle. A comparison of the drawings shows appellant's pipe stem to be different from those of the references, both as to proportions and to angle of the curves. The overall appearance of appellant's pipe is decidedly different from any of the cited references. We think that the combination of the redesigned configuration of the golf club head with the redesigned and different proportion and angle of appellant's pipe stem results in a smoker's pipe which is distinctive, new and ornamental in appearance, aesthetically pleasing, and which required the exercise of the inventive faculty. Therefore, the decision of the Board of Appeals is reversed."

Here there was not only a redesign, but an entirely new conception was laid bare.

■ While the citation of mechanical patents may have a place in the adjudication of a design patent, the present

task is not complicated by the existence of the Bugg mechanical patent. Judge Hough may be quoted for a concise statement of the law on this subject, Bayley & Sons v. Standart, etc., 2 Cir., 249 F. 478, at page 479:

"If the same man at the same time devises a container of pleasing design and a mechanical contrivance conveniently united with the aesthetic covering, he has made two inventions; and, though he patents one, that is no reason why within the statutory two years he may not patent the other. Such act would not be necessarily a case of double patenting, which is always unlawful. The question is unaffected by the accident that one of the two compared patents is for a design and the other for a mechanical arrangement of matter; and it is always the same, viz.: Is the same thing or inventive thought disclosed by both? Williams [Calk] Co. v. Neverslip, etc., Co., C.C., 136 F. 210; President [Suspender] Co. v. Macwilliam, D.C., 233 F. [433] 439."

◼ Also it was said in In re Barber, Cust. & Pat.App., 81 F.2d 231, at page 232:

"It is also well established that while, as a matter of law, one may have a mechanical patent and a design patent upon the same subject-matter, there must be a clear patentable distinction between the two; or, in other words, they must involve different inventions."

◼ Invalidity is further urged because of the functional elements of the plaintiff's design, and if this means that only a design which comprehends no useful elements can be the subject of a valid design patent, it does not correctly state the law. The statute is not restricted to solely aesthetic concepts.

◼ Judge Hough said in Dietz Co. v. Burr, etc., 2 Cir., 243 F. 592, at page 594:

"While design patents are not intended to protect a mechanical function, or to secure to the patentee monopoly if any given mechanism or manufacture as such, it is immaterial that the subject of the design may embody a mechanical function, provided that the design per se is pleasing, attractive, novel, useful and the result of invention. Ashley v. Weeks, etc., Co. [2 Cir.], 220 F. [899] at [page] 901, 136 C.C.A. 465. But it is the design that is patented, not the mechanism dressed in the design."

See also, In re LaMontagne, Cust. & Pat.App., 55 F.2d 486, at page 488.

◼ Sufficient has been shown to establish the test of patentability of a design patent as it has been ordained through the years and applied in numerous cases in this Circuit, and which is somewhat expounded in General Time Instruments Corp. v. U. S. Time, etc., 2 Cir., 165 F.2d 853, at page 854, wherein the opinion states:

"In short, the test is whether the design involved 'a step beyond the prior art requiring what is termed "inventive genius." ' "

There was no precursor in design of the plaintiff's pipe, in contrast to the ladies' handbag in Gold Seal Importers v. Morris White Fashions, 2 Cir., 124 F. 2d 141, the alarm clock discussed in General Time Instruments Corp. v. U. S. Time, etc., supra, and the wrist watch in the Tourneau case, supra.

◼ In the opinion of this court the plaintiff's Falcon pipe design patent discloses a pipe and stem construction which was neither disclosed nor suggested in any of the patents cited against it, either in the Patent Office or in the defendant's brief on this trial. This means that the design of the Falcon pipe is indeed "a step beyond the prior art" and therefore constitutes invention in that it is new and original.

The remaining requirement that it be ornamental[1] is equally present in my opinion, for the configuration of the metal stem, the form and construction of the side supporting elements and the way in which their integration has been accomplished, and the manner in which they are disposed with reference to the smoke tube, which is itself ornate, constitute such a pleasing and eye arresting combination, that there is no hesitancy whatever in stating that the entire design is ornamental and pleasing in the visual sense.

Doubtless this aspect of the design has contributed to the commercial success of the Falcon pipe, which is not always a consideration to be brushed aside, Nebel Knitting Co. v. Sanson, 4 Cir., 214 F.2d 781, at page 782, first paragraph left hand column, near close.

### Finding

12. The plaintiff's design patent, Des. #142,280, discloses a new, original and ornamental design for a smoker's pipe and is the product of invention; this finding is made with Tit. 35, U.S.C. § 103 in mind, whether it applies or not.

The said patent is valid.

### Infringement Finding

13. The defendant's Viking pipe infringes the plaintiff's Falcon pipe in that the design is so similar that even the most cursory comparison of the two products reveals their resemblance in all substantial respects, the only visual difference being that the side elements of the defendant's shank are connected by two cross-over elements about an eighth of an inch wide, spaced apart so as to nearly divide into three parts so much of the shank as exposes the smoke tube of the defendant's structure, and that difference is so trivial that infringement is not thereby avoided. The same remark applies to the lack of convolutions in the smoke tube of defendant's pipe, as contrasted with the plaintiff's.

### Comment

A comparison of the two products here involved is thought to reveal such a condition as was referred to in the case of Ashley v. Samuel C. Tatum Co., D.C., 240 F. 979, at page 982, in which it is said:

"The defendant's inkstand is undoubtedly within the claims of the reissue patent and contains all the dominant features of the Ashley design. It is not enough for defendant, while using this design as a basis, to superimpose ornamentation thereon, even though the ornamentation is sufficient to make defendant's inkstand readily distinguishable by the casual observer from complainants."

Comments by Falcon users heretofore quoted show that casual observers have been misled into thinking that the defendant's product is that of the plaintiff.

The test as stated in Gold Seal Importers v. Morris White Fashions, supra [124 F.2d 141], has been adopted in the making of this finding:

" * * * The test of infringement is whether the two designs have substantially the same effect upon the eye of an ordinary observer who gives the matter such attention as purchasers usually give. (Citing cases.)"

### Conclusions of Law

II. The plaintiff's design patent, Des. 142,280, is valid.

III. The defendant has infringed the said design patent in the manufacture and sale of the Viking pipe.

### Third: The Plaintiff's Mechanical Patent

The plaintiff's mechanical patent No. 2,581,169 was granted January 1, 1952 to the plaintiff's assignor, Bugg.

The claims of the patent are for a combination of elements well-known; this means that it is the combination itself

---

1. The Century Dictionary defines "ornamental" in part as "adding or lending beauty, grace, or attractiveness."

which is urged to disclose patentable invention not taught by the art.

The plaintiff's pipe consists of a briar bowl screwed into a bowl holder, the purpose of which is (a) to entrap the liquid concentrate resulting from the burning of tobacco in the bowl, and (b) to cool the smoke resulting therefrom; also to provide access for a smoke tube, and a shank structure in which the same tube is carried to the bit.

The bowl holder contains a hollow dome about 5/16 of an inch in diameter (open at the bottom), which is integral with the holder and rises therefrom in the center and enters an opening in the bowl provided to receive it; the flat top of the dome thus serves as the bottom of the bowl although it protrudes upwardly so that it is imperceptibly above the plane of the bottom of the briar bowl; the dome does not fit snugly in the opening, whereby a peripheral space is created, into which the liquid concentrate is said to enter and fall to the basin of the bowl holder which is so contrived as to be a receptacle therefor. A smoke tube extends laterally from the bowl holder to the bit, which tube is completely exposed and is held in engagement with the bit by the shank structure consisting of two side elements (integral with the bowl holder) which merge about ½ inch from the bit; thus the cooling object of this assemblage involves the functioning of the dome which has been described and also that of the smoke tube, so that when the smoke enters the bit it is at a lower temperature than would have been true had the tube been directly connected with the bowl as in a conventional briar pipe.

The issue of infringement presents no difficulty whatever, for the defendant's pipe closely copies the plaintiff's in all essential respects, and the issue therefore would be unhesitatingly resolved against the defendant if the validity of the plaintiff's patent were to be established.

At the outset it is to be remembered that since any cooling of smoke from the combustion of tobacco in the bowl of a pipe, before it reaches the mouth of the user, creates the necessity for a size-able conduit or shank between the bowl and the bit, the room for patentable mechanical invention as to its form is minimal at this late date in the history of pipe making.

This is probably true as to the substitution of aluminum for briar in the constituency of the shank (as shown, for instance, in Kirsten No. 2,200,237), although, to quote from Gelardin v. Revlon, 2 Cir., 164 F.2d 910, 911:

"* * * it would be as absurd to maintain that the substitution of a new material can never require originality, as that it could never make a profitable advance."

See also, Minton Manufacturing Co. v. Continental Briar etc., 2 Cir., 93 F.2d 271.

The result of the substitution here is thought to illustrate the distinction pointed out in the quotation from Bayley & Sons v. Standart, supra, namely that the same inventive thought is not disclosed in these respective design and mechanical patents. The latter shows, as to the shank, only a lighter construction than in an all-briar pipe, while the former—as to this aspect of the design—reveals an entirely new and original concept which is artistic and so visually attractive as to arrest attention, and to have invited imitation by this defendant.

As to the metal smoke tube as a separate element, two considerations are involved, namely (a) removability for cleaning purposes, and (b) its adaptation as a smoke cooling element. It is common knowledge that over 25 years ago pipes were manufactured and sold with removable metal tubes to serve purpose (a); they fitted into the bit at one end and the shank at the other, and probably first gained acceptance when Dunhill pipes appeared on the market.

As to (b), the cooling properties of such a metal tube were disclosed in:

Fritz, U. S. Patent No. 165,814 (1875)

This patent for an improvement in pipe stems claims "A double pipe-stem

consisting of an exterior and interior stem, the former having a lateral air-passage, substantially for the purposes set forth." (The interior stem may be made of metal or other material "that will cool off suddenly.")

The exterior stem, according to the specification, is slotted longitudinally and the statement is:

"The relative size of the two stems, and of the slot in the exterior stem, is such that there will be left sufficient space between the two stems for the air to circulate freely around the inner stem through the slot in the outer stem."

Ryberg, Swedish Patent No. 57,501
(1923)

This is for a briar pipe, the bowl and stem of which are integral and the stem is attached to the bit; as heretofore stated in connection with the design patent, a conical cavity is scooped out of the top of the stem for the greater part of its length between the bowl and the bit, which acts as a channel to contain a detachable tube which is first inserted into the bit and then into the mouthpiece. The patent states:

"When smoking, tube E is being cooled, refreshing at the same time the smoke."

The art therefore knew of the use of such a tube for cooling purposes as well as to afford easy cleaning.

It is therefore necessary now to analyze the elements constituting the bowl assembly to ascertain whether patentable invention is therein disclosed.

All three claims are in suit. The most comprehensive are 2 and 3:

"2. A pipe comprising a dished bowl holder formed of thin metal, said bowl holder having a central flat topped hollow condensing dome surrounded by a circular trap chamber, enclosed by the outer dished walls of the bowl holder, the holder having a lateral draw tube receiving opening formed in the outer dished walls at a point above the bottom of the trap chamber, and a bowl fitting within the upper portion of the bowl holder and secured to the outer walls thereof, the bowl having a downwardly and inwardly extending lower flange spaced above the lower wall of the trap chamber, said flange forming the upper wall of said chamber, the inner edge of said flange forming a circular opening and spaced from the condensing dome to form a circumferentially extending opening about said dome, the upper face of the lower bowl flange extending inwardly in substantially the plane of the top of the condensing dome.

"3. A pipe comprising a dished bowl holder formed of metal, a bowl fitted in the holder, a passage leading from the bowl, the holder having a lateral opening formed therein, spaced metal stem members extending from the bowl holder on opposite sides of the opening, a cup like bit receiving member forming the outer ends of the stem members, an opening in said bit receiving in alignment with the lateral opening in the bowl holder, a bit fitted in the bit receiving member and a draw tube of metal between and spaced from the stem members, said draw tube having its ends detachably fitted in the opening in the bowl holder and in the bit."

The foregoing are understood to disclose in lowest terms:

(I) A detachable bowl holder of thin metal, which contains:

(a) A condensing hollow open (at the bottom) dome, in the center of the holder which extends upward so as to enter an opening in the briar tobacco bowl;

(b) A cup-shaped space around the base of the dome through which smoke passes to the smoke tube and which space also receives concentrate resulting from the burning of tobacco in the bowl;

(c) An aperture on one side to receive the end of the smoke tube; also two lateral extending stem members

which are prolonged to the bit, and support centrally between them a smoke tube.

(2) A briar bowl to hold the tobacco which screws into the bowl holder and is therefore detachable therefrom; this bowl is open at the bottom to receive the dome, the top of which is substantially in the plane of the bottom of the bowl.

As has been stated above, the dual purpose of the assembly is to trap concentrate prior to the entry of smoke into the smoke tube; and to cool that smoke within the trap and also during its passage in the exposed smoke tube prior to reaching the bit.

The following patents constitute pertinent disclosures of prior art:

### Kohler (German) Patent No. 712,394 (1941)

This pipe discloses a detachable bowl having a bottom opening; the bowl is engaged in a supporting member called a housing which contains two chambers one above the other, divided horizontally by a cross-wall, having a central opening through which a cone rises from the bottom of the lower chamber, and through the bottom opening of the bowl, slightly above the plane of that opening. The upper chamber has a side opening through which smoke passes into the stem.

There is an opening around the cone, and the opening through which the cone rises is formed by the two elements of the cross-wall which are curved downward.

The bottom of the housing (and of the lower chamber) screws into the sides thereof and thus can be removed. The lower chamber receives the liquid concentrate resulting from the burning of the tobacco held in the bowl.

Kohler says that his invention and advance over the prior art "consists in that distributor cone comes up to the bowl or tobacco container, whereby it penetrates through the cross wall as well as the bottom aperture of the tobacco container. This makes possible at the bottom of the tobacco container when packing tobacco to leave a small space around the cone where the humidity of the tobacco can change into a liquid and flow on the cone through the cross wall to the lower chamber. The smoke outlet of the nozzle of the pipe opens into the upper chamber so that the tobacco smoke does not come in touch with the separated tobacco juice and so cannot absorb the unpleasant taste and smell."

The single claim is consonant with the foregoing.

The cone of Kohler is not stated to be hollow, and is not open at the bottom as in plaintiff's pipe; nor is its top substantially in the plane established by the two sides of the opening in the bowl. The smoke moves from the upper chamber into the bit, while in the Falcon pipe the course of travel is from around the lower end of the dome into the bit.

Kohler's structure seems to be planned only for the trapping of concentrate, the office of the cone being to supply a surface on which the liquid concentrate can flow into the lower chamber.

### Silber, U. S. Patent No. 2,236,076 (1941)

This is for a no-shank pipe so called, and shows a bowl base and shank of unitary construction, with a bowl screwed to it, which is therefore detachable. Under the bowl is a cup shaped metal liner element, the upper surface of which contains a central upward extending tubular extension which enters a central opening in the bowl, the top of which in effect is the bottom of the interior of the bowl.

The bowl base contains a condensing chamber, the only openings being the lower aspect of the tubular extension, and one just under the top surface of the chamber, at the side, being the aperture through which smoke makes its way to the bit.

The bowl section is preferably of briar, while the bowl base and bit may be of other material as selected.

One object is to present a pipe structure "having intermediate the bowl and

combined stem (shank?) and base sections a metal-lined condensing chamber, the lower part of which is bowl-shaped to act as a reservoir for moisture and condensed tobacco extracts, such as nicotine and the like."

The claims need not be quoted, since the essential nature of the invention is believed to be the condensing chamber. The liquid concentrate seems to enter the tubular extension and pass through it into that chamber; the latter is not a dome or cone, but a conduit or miniature manhole, the presence of which is required by the nature of the top portion of the chamber.

The detachment of the bowl from the bowl base affords the means for removing liquid concentrate from the latter.

The specification states that the pipe structure as taught "entirely eliminates the wooden shank portion found in the conventional pipe. This means that the smoke, instead of condensing in the wooden shank and becoming absorbed therein, condenses in a metal-lined chamber which is non-absorbent. As a result the foul odor and bitterness, so often found in a pipe, is permanently prevented, and the pipe will always provide a sweet, cool and dry smoke."

This seems to be the only mention of a cooling aspect of the construction.

Since Ryberg and Fritz, supra, do not involve bowl construction, the defendant's asserted reliance upon them does not invite discussion in this connection.

### Benjamin, U. S. Patent No. 2,276,266 (1942)

Here is disclosed a pipe with a non-removable bowl, having an opening in the bottom which is filled by a plug and screw threading into the plug. The screw contains cross slots, the horizontal slot lying within an open chamber (part of the shank) into which is disposed the draw tube which connects with the bit. Suction produces a current through both slots. The vertical slot rises to the top of the plug, which latter forms the bottom of the bowl; suction is thus communicated to the tobacco " * * * with

the result that smoke is drawn down through the charge of tobacco and passes through opening 15 (hole in bottom of bowl) and through the passages 22 and 23 (the cross-slots) through and around and in intimate contact with the screw 20 and its threads, so that noxious material entrained in the tobacco smoke and vapors will be separated out of the tobacco smoke and fall and accumulate in the passage 13 (the chamber), whence the same may be easily removed upon removal of the screw and the plug 17, without the use of any special tool."

Seemingly it is the noxious elements in the smoke, rather than in the liquid concentrate from the burning tobacco, the removal of which this patent teaches,—the purpose being to cool the smoke. The construction of the screw is said to promote complete combustion of the tobacco. The single claim is for the assembly of the elements above sought to be described in lowest terms.

### Ballin, U. S. Patent No. 2,231,176 (1941)

This patent is for a pipe said to contain means to promote condensation, and to absorb and retain the trapped concentrate, and to filter the smoke before it enters the mouthpiece. The purpose is said to be accomplished by inserting a removable collar (a piece of conventional pipe cleaner) disposed around the spindle of the plug about to be described; and additionally, a helically disposed member of the same nature, within a horizontal space adjacent to the bottom of the pipe, and within the shank to which the bit is attached.

The said collar is placed around the element known as the plug, which is comprised of a button having a shoulder, a cap, and a spindle connecting the shoulder with the button. The plug is inserted in a hole in the bottom of the bowl, at the center. In position, the upper face of the button "is substantially flush with the upper edge of the said hole (in the bottom of the bowl) and forms a grate at the bottom of the bowl 10 with a relatively small clearance around the

grate." The shape of the plug is such that "a condensation chamber 23 is provided between the button (17) and the shoulder 18 which connects with the tube 12 (the space above called the chamber)."

This latter space takes the helical disposed pipe cleaner, the office of which is to absorb the moisture content of the smoke; whether the space also is expected to act as a spillway for condensate overflowing the said condensation chamber 23 is probably unimportant for present purposes; since there is a connection between the two, there could be such a result.

Ballin thus describes his invention:

" * * * I have provided a tobacco-smoking pipe in which cooling air is provided for promoting condensation of the products of combustion in the condensation chamber, and means are provided for absorbing the condensate and filtering the smoke passing through the pipe."

Thus the art knew:

a. A detachable bowl, having a central bottom opening. Kohler and Silber.

b. A receptacle or lower chamber beneath the bowl to receive liquid concentrate. Kohler and Silber.

c. A circular element integral with and rising from the receptacle or lower chamber, and so disposed as to occupy the said bottom opening in the bowl but not so completely as to seal that opening. Kohler and Silber. A hollow element of this general kind was taught by Sasser (No. 1,763,185).

d. Entrance to the draw tube of the pipe at the side of the lower chamber. Kohler and Silber.

As to (b) the substitution of metal (aluminum) for briar or other material was more in the nature of an expedient than invention, if the teaching of Gelardin v. Revlon, supra, is understood.

The adaptation of the bowl assemblage as devised by Bugg, plus his molded form of attachment to the stem which was new, completes the combination of elements upon which plaintiff relies.

The inquiry is the proverbial one as to whether that mythical figure, one skilled in the art (who has compiled an impressive record of leaving undone those things which he ought to have done), would have naturally reached the end result of Bugg without the exercise of the inventive faculty.

The rule is stated in A. & P. v. Supermarket, 340 U.S. 147, at page 152, 71 S.Ct. 127, at page 130, 95 L.Ed. 162:

"The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test."

The conclusion which is reluctantly arrived at, in view of defendant's intentional adaptation of the plaintiff's device, is that the combination as disclosed in the Bugg patent is a tobacco pipe possessing no attributes or functions not previously known to the art and disclosed therein, in forms not essentially different to the Falcon pipe.

Finding

14. Bugg Patent No. 2,581,169 is invalid for failure to disclose patentable invention.

If the foregoing shall be found to be erroneous, a new finding to the contrary effect should be made, and in that event there will be a finding of infringement on the part of the defendant, in that its Viking pipe is substantially the same in structure as the Falcon, the result being studied and deliberate, and that it

performs the same functions in substantially the same way.

Conclusion of Law

IV. The Bugg patent No. 2,581,169 is invalid for failure to disclose patentable invention.

▪ Decision was reserved at the close of the trial concerning the admissibility of a tabulation of polls taken at the Automobile and Motor Boat Shows in Chicago during the year 1954. The objection to the receipt of the said tabulation and to the testimony in support thereof is sustained.

It follows that the plaintiff is entitled to a decree against the defendant with costs as to unfair competition, and for infringement of the plaintiff's design patent, with an appropriate injunction, and provision for the ascertainment of plaintiff's damages. The subject of counsel fees should be presented separately. Plaintiff's cause based upon its mechanical patent must be dismissed.

Settle decree.